**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Elizabeth E. Brown

| | |
|---|---|
| In re: ) | |
| ) | |
| THREADNEEDLE STREET, LLC, ) | Case No: 10-40314 EEB |
| ) | Chapter 11 |
| Debtor. ) | |

**ORDER ON OBJECTION TO PROOF OF CLAIM
FILED BY ASPEN D/S HOLDINGS, LLC**

THIS MATTER comes before the Court on the Debtor's Objection to the Amended Proof of Claim No. 6 of Aspen D/S Holdings, LLC ("Aspen"). By the time of the evidentiary hearing, the Debtor had narrowed its objection to this secured creditor's claim to two questions: (1) whether Aspen was entitled to charge interest on its costs, expenses, and fees incurred; and (2) whether Aspen's legal fees are unreasonable in amount. Following an evidentiary hearing and after a careful review of the Aspen's legal billing statements, the Court hereby FINDS and CONCLUDES:

**A.     Background**

This case is a single asset real estate ("SARE") case. The property in question consists of 140 acres of improved real property in the Diamond Star Ranch subdivision of Eagle, Colorado (the "Property"). The Property is a luxury home, used by the Moore family as a vacation home and is non-income producing. On September 13, 2006, the Debtor executed a promissory note (the "Note") in the principal amount of $3,000,000 to Lake Forest Bank and Trust Company (the "Bank"), which was set to mature in two years. The Debtor also executed a mortgage secured by the Property (the "Mortgage"), a Business Loan Agreement, and an Assignment of Rents. The Bank agreed to extend the Note's maturity date twice, but when it matured on September 13, 2009, the Bank refused any further extensions. The Debtor has been unable to obtain refinancing from another lender. Thus, the Note went into default, with default interest accruing at the rate of 9% per annum.

The Bank then proceeded to enforce its rights under the Mortgage. In February, 2010, the Bank filed a foreclosure action in Eagle County District Court. The Bank subsequently sought the appointment of a receiver in order to preserve the Property. In April, 2010, a fire had occurred under the boiler in the basement of the main house on the Property. At the time of the fire, the Debtor did not have insurance on the Property. One week later, the Bank agreed to terminate the receivership in order to foster settlement discussions. These discussions bore fruit in the form of an agreed Order, Judgment and Decree of Foreclosure (the "Consent Judgment"). In the Consent Judgment, the parties stipulated to the amount due under the Note, including interest, costs and attorneys' fees, as of July 27, 2010. The foreclosure sale was scheduled for October 22, 2010.

Prior to the foreclosure sale, two significant events occurred. The Bank sold the Note to Aspen on September 22, 2010. Then, on October 8, 2010, the Debtor filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "First Bankruptcy"). One week later, the Debtor filed an emergency motion to obtain approval of post-petition financing ("DIP Financing"), to be provided by insiders, and secured by a senior lien on the Property, priming Aspen's lien. Aspen objected and countered with its own motion, seeking to dismiss the case. After discovery had commenced on the motions, the Debtor consented to dismissal of the First Bankruptcy. It was dismissed less than one month after the petition date, on November 3, 2010.

On November 10, 2010, Aspen filed its own receivership action in Eagle County in order to preserve the Property. The Debtor had not yet repaired the fire damage to the boiler. With winter fast approaching in the mountains, steps had to be taken promptly to ensure that the home would be sufficiently heated to prevent frozen pipes and further damage to the Property. Aspen also proceeded with foreclosure. On December 2, 2010, the day before the scheduled sale, the Debtor filed this Chapter 11 case (the "Second Bankruptcy"). Early in this case, Aspen filed another motion to dismiss for bad faith filing, as well as a motion for relief from stay and a request to excuse turnover by the receiver (the "Aspen Motions"). Preliminary hearings on the Aspen Motions were scheduled for January 13, 2011, but the parties later stipulated to continue the hearing until March, 2011.

On January 20, 2011, the Debtor filed a proposed plan and a motion to approve up to $400,000 of DIP Financing from insiders to be secured by a *junior* lien on the Property. The Debtor represented that it would use the DIP Financing to repair the fire damage, make adequate protection payments to Aspen, and to market the Property. Following discovery and a preliminary hearing, the parties ultimately reached a stipulation and the Court approved the DIP Financing on an unsecured basis. They further agreed to combine the final hearings on the Aspen Motions with the confirmation hearing on the Debtor's plan. The Stipulated Order submitted by the parties required, among other things, that the Debtor obtain insurance on the Property by a date certain, pay the 2010 real property taxes when due, and make monthly adequate protection payments to Aspen on the first day of each month. The Stipulated Order granted Aspen the right to seek *ex parte* relief from stay in the event of an uncured default.

Sadly, the Debtor did not timely perform its promises, causing the parties to incur additional legal fees. When the Debtor did not provide proof of continuing insurance on the Property, Aspen had to obtain emergency relief to allow its insurance inspector to inspect the Property in order to avoid cancellation of its "force-placed" insurance. When the Debtor failed to pay the May 1, 2011 adequate protection payment and the 2010 taxes, Aspen once again had to resort to relief from stay. The Debtor then made late payments on both, resolving the stay relief matter, but this pattern of late payments continued. As representative of the Debtor, Mr. Moore testified that the Debtor never made its adequate protection payments on the first day of the month, but instead always waited until after it had received a default notice from Aspen and then further delayed until the very end of its grace period.

The parties have engaged in significant additional proceedings in this case. They have conducted extensive discovery that led to several discovery disputes brought to the Court's attention. Aspen also filed claims objections. Early in the case, Aspen investigated the possibility of purchasing claims from other creditors in order to control voting on any reorganization plans submitted by the Debtor. In pursuit of this goal, Aspen discovered that most of the unsecured claims listed by the Debtor were not actually claims owed by the Debtor. These creditors were not even familiar with the Debtor. The claims were instead owed by another Moore family company, Moore Land and Cattle ("MLC"). Since the Debtor did not amend its schedules to remove these creditors, Aspen filed objections to these claims. The parties have also been engaged in protracted litigation regarding the amount of Aspen's claim, which led to a two-day hearing on the reasonableness of the fees charged by Aspen's counsel.

In addition, Aspen has incurred fees and expenses in its attempt to collect from its guarantor, Paul Moore. Aspen filed suit in Illinois (the "Guaranty Suit"), hiring The Wix Law Group, LLC as lead counsel. The Illinois court entered summary judgment against Mr. Moore on his liability as a guarantor, but set a November 7, 2011 hearing on damages. Aspen's attorney, Mr. Schmidt testified that he had to spend a whole day on the damages hearing in part because Mr. Moore and his counsel, Mr. Grumley, disappeared for several hours. After repeatedly calling Mr. Grumley's office, Mr. Schmidt eventually found him outside the courthouse, smoking a cigar.

At the end of August, 2011, the Debtor filed a motion to approve a second round of DIP Financing from the same insiders (Mr. Moore's brothers) in the amount of $3,950,000, to be secured by a priming lien on the Property (the "Second Financing Motion"). This Second Financing Motion was filed in conjunction with the Debtor's Amended Plan of June 10, 2011 (the "Plan"). The terms of the motion and the plan provided that the funds would be used to pay only the principal amount of Aspen's claim, plus $250,000 of interest. This payment was conditioned on stopping the interest clock on the balance of Aspen's claim and a release of Aspen's lien on the Property. Instead Aspen's lien would attach to the funds to be held in an escrow account in the amount of $700,000. From this escrow account, the Debtor would draw the amounts necessary to repair the Property, pay administrative expense claims against the estate, and the balance would be held until further litigation determined the proper amount of Aspen's claim. The plan was also premised on the sale of the Property, despite the fact that the Debtor had already been attempting to sell it since 2007 or 2008, without success. Not surprisingly, Aspen objected to both the Second Financing Motion and confirmation of the Plan.

**B.     The Amended Claim**

At trial, Aspen updated the amount of its claim as of December 9, 2011 to $4,154,459.72. This amount reflects the stipulated amount of its claim set forth in the Consent Judgment, which liquidated the claim as of July 27, 2010 (the "Consent Judgment Amount"), to which it added interest at the 9% default interest rate, plus additional fees and expenses incurred after July 27, 2010. In addition, Aspens asserts its right to interest on the fees and expenses. The amount of its claim as of December 9, 2011 was broken down as follows:

3

1. $3,514,559,23 - the Consent Judgment Amount, plus interest from July 27, 2010 to the petition date;
2. $70,198.71 - additional expenses plus interest to the petition date;
3. $82,250.29 - additional legal fees plus interest to the petition date;
4. $316,795.74 - post-petition interest on the judgment;
5. $12,535.66 - post-petition expenses plus interest;
6. $7,558.43 - post-petition interest on pre-petition legal fees;
7. $358,626.66 - post-petition legal fees plus interest;
8. $1,234.90 - post-petition deposition transcript costs;
9. ($201,500.00) - credit for adequate protection payments; and
10. ($7,799.90) - credit for Garfield & Hecht fees incurred prior to the Consent Judgment, but which were not included in the Consent Judgment.[1]

Aspen continues to object to this claim on two grounds: (1) Aspen is not entitled to charge interest on fees, costs and other expenses; and (2) the amount of legal fees added to the Note are unreasonable.

### 1. Aspen's Entitlement to Interest on Fees, Costs and Expenses

The Debtor contends that the Note does not entitle Aspen to interest on expenses, attorneys' fees, and costs, which is true. Other loan documents executed by the Debtor, however, expressly provide for the assessment of interest on these additional charges. First, page 3 of the Mortgage provides:

> LENDER'S EXPENDITURES. If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay . . .Lender on Grantor's behalf may . . . take any action that Lender deems appropriate, including but not limited to paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. *All such expenditures incurred or paid by Lender for such purposes will bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date or repayment by Grantor.*

---

[1] The updated figure of $4,154,459.72 already reflects a subtraction from the amount of Aspen's proof of claim that had previously included $7,799.90 in fees incurred by Garfield that were attributable to services rendered before the Consent Judgment. Because the parties had agreed to a comprehensive claim amount and the state court entered a judgment based on this stipulation, this Court would not allow either side to add or subtract to the amount set forth in the Consent Judgment. Instead the Court has treated the Consent Judgment Amount as a final determination of all amounts owed by the Debtor to Aspen as of July 27, 2010.

4

>All such expenses will become a part of the indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

(emphasis added).

Further, page 6 of the Mortgage and page 4 of the Assignment of Rents both provide:

>Attorneys' Fees; Expenses. If Lender forecloses or institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon appeal. Whether or not any court action is involved, and to the extent not prohibited by law, *all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include*, without limitation, however subject to any limits under applicable law, *Lender's attorneys' fees* whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports, . . . surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

(emphasis added).

Finally, page 3 of the Business Loan Agreement and page 2 of the Assignment of Rents state:

>LENDER'S EXPENDITURES. If any action or proceeding is commenced that would materially affect Lender's Interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, *Lender on Borrower's behalf may* (but shall not be obligated to) *take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied upon or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the Date incurred or paid by Lender to the date of*

5

> *repayment by Borrower.* All such expenses will become a part of the indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any Installment payments to become due during either (1) the term of the applicable Insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

(emphasis added).

Accordingly, Aspen is entitled to claim and receive interest on expenses, attorneys' fees and costs.

### 2. Necessity and Reasonableness of Post-Petition Fees and Costs

As an "oversecured" creditor, Aspen is entitled to reimbursement of its post-petition expenses, fees and costs to the extent that they are reasonable. 11 U.S.C. § 506(b). The Debtor did not objected to any of Aspen's expenses, but it has asserted that the amount of its legal fees are unreasonable. What is reasonable is determined by the facts and circumstances of the particular case. *In re Ward*, 190 B.R. 242, 245 (Bankr. D. Md. 1995). Creditors are entitled to retain counsel and pay for comprehensive representation. But "where services are not reasonably necessary or where action is taken because of the attorney's excessive caution or overzealous advocacy, the courts have the right and the duty, in exercise of their discretion, to disallow fees and costs under § 506(b)." *In re Kroh Bros. Devel. Co.*, 105 B.R. 515, 521 (Bankr. W.D. Mo. 1989). The burden of proving reasonableness is on the attorney applying for the fees. *See*, e.g. *In re Dalessio*, 74 B.R. 721, 723 (9th Cir. BAP 1987).

Rather than dispute specific time entries or provide the Court with recommended dollar reductions, the Debtor chose to focus its arguments at the hearing on the "lumping" of time entries in the attorney billing statements of Aspen's counsel. "Lumping" is a term used in the bankruptcy world to describe a time entry that contains a description of several activities by an attorney with only a single time entry, as opposed to an entry that gives a separate time allotment for each activity. For example, a proper billing entry would state "telephone call with opposing counsel regarding claim amount (.3); drafting objection to plan (1.3); and conference with client regarding strategies for claim objection hearing (.5)." A "lumped" time entry would describe each of these activities, but would only give one combined time entry of 2.1 hours. Debtors' counsel in this district are well versed that their fee applications must not reflect "lumping." On the other hand, it has never been very clear in this district whether counsel for secured lenders are subject to this same restriction.

At hearing, the Court asked Debtor's counsel whether it believed Aspen should be prohibited from receiving any fees due to lumping. Counsel responded that some fees would still be justified. When pressed by the Court for a dollar figure that would be reasonable, the Debtor's counsel asserted that Aspen should be penalized for lumping by reducing its fees to one third of the amount billed.

6

While lumping of time entries is generally disfavored in bankruptcy, creditors seeking to meet their burden under § 506(b) need only provide a fee application and supporting documentation containing sufficient specificity to enable the bankruptcy court to determine the reasonableness of the requested fees and costs. *Dalessio*, 74 B.R. at 724; *Ward*, 190 B.R. at 246; *Kroh*, 189 B.R. at 963. Having reviewed the unredacted billing statements of Aspen's counsel, I find that they contain sufficient specificity for the Court to assess the necessity and reasonableness of the services rendered. Therefore, an overall percentage reduction based on lumping is neither necessary nor appropriate.

Before turning to the specifics of the fees sought by Aspen, the Court must add some general observations about this case in order to relate its ruling to the particular facts and circumstances of this case. It is this Court's general impression that it is the Debtor's actions that have multiplied these proceedings and unnecessarily driven up the costs of both parties. The Court strongly suspects that these proceedings have been unnecessarily drawn out by Mr. Grumley, rather than Debtor's local counsel. The Court bases this suspicion on the Court's observations at the hearing, the testimony of Mr. Schmidt, and the fact that the Court has never before observed Debtor's local counsel engaging in this type of conduct.

One of the reasons that the Court has formed the impression that it is the Debtor that has caused both parties to incur unnecessary fees is based on the fact that this case exhibits many of the earmarks of a bad faith filing. This is the Debtor's second bankruptcy filing in less than two months. Both cases were filed close to scheduled foreclosure sales, the second the evening before the scheduled sale after appointment of a receiver. This is largely a two-party dispute between Aspen and the Debtor. After removal of the improper claims successfully objected to by Aspen, the Debtor has few unsecured, non-insider creditors holding relatively small claims when compared to the amount owed to the secured creditor. This is a non-operating, non-income producing, single asset real estate case, in which the Property has unrepaired, uninsured fire damage. Initially, there were questions about whether the Property was even protected from the elements. The Debtor has no employees, other than a caretaker who is supposed to be paid by the lessee - also an insider, who has paid none of the expenses it agreed to pay and the Debtor has taken no action to secure payment from this insider lessee. The Debtor simply has no income and no business – other than its ownership of the Moore family's vacation home. Although this case has been pending for over a year, the Debtor has not repaired the fire damage and has apparently made no efforts to market or sell the Property, despite repeated assertions to this Court that it intends to do both. In fact, contrary to its oft-stated intention to sell the Property, the Debtor has never even sought to employ a real estate agent. The proceedings in this case, and in the related litigation, have been convoluted, inefficient and prolonged. Mr. Schmidt's testimony regarding what happened during the damages hearing in the Guaranty Suit is a good example of how the actions of Debtor's counsel have caused the fees incurred by both parties to increase. Finally, the Debtor's pending plan of reorganization is seriously flawed. Against this background, the Court will now assess the fees that Aspen seeks to include in its secured claim pursuant to § 506(b).

#### a. Post-Petition Fees and Costs Charged by Garfield & Hecht, P.C.

Garfield & Hecht, P.C. ("Garfield") is the Aspen, Colorado law firm that represented the Bank and then Aspen in the Eagle County foreclosure and receivership proceedings. The Debtor has argued that, once Aspen was represented by Bieging Shapiro & Barber LLP ("BSB") in the Second Bankruptcy and The Wix Law Group ("Wix") in the Guaranty Suit, there was no further reason for Garfield to continue its representation. The Debtor seeks disallowance of all of Garfield's post-petition fees and costs. At first blush, the Court was inclined to agree. Mr. Schmidt's testimony on Garfield's behalf, however, painted a very different picture. He convinced the Court that the repeated misstatements by the Debtor in court filings as to the past history of these parties necessitated a more active role on his part in reviewing and consulting with BSB and Wix than would normally have been considered reasonable.

That is not to say, however, that all of the fees charged by Garfield should be allowed. The Court has reviewed Garfield's invoices and has determined that some entries should be disallowed. Garfield has charges during the pendency of the First and Second Bankruptcies for: tasks that were not necessary in light of the automatic stay ($ 4,009.00), time entries that do not provide sufficient information to determine the reasonableness of the amount billed ($ 371.00), work performed that was not related to protection and collection of Aspen's secured claim ($ 5,497.50), work performed at an inappropriate level ($ 1,089.00), travel time billed at the full hourly rate ($ 2,808.00), and excessive time for the service provided ($ 1,193.50). With respect to this final category, the disallowance relates primarily to time billed preparing payoff figures when the initial billing statements provided to the Debtor for this purpose were so heavily redacted that they were unusable, requiring the task to be repeated several months later at the Court's direction. The specific charges which the Court is disallowing are detailed in Attachment A, which is incorporated herein. Of total fees and costs charged in the amount of $89,377.14, fees in the amount of $14,968.00 are disallowed, and fees and costs totaling $74,409.14 through December 9, 2011 are allowed.

#### b. Post-Petition Fees and Costs Charged by Bieging Shapiro & Barber, LLP

BSB is Aspen's bankruptcy counsel in the Second Bankruptcy. The Debtor contends that BSB's post-petition fees should be reduced by at least 80%. Again, the Debtor has not pointed to any specific time entries. Instead, the Debtor points to: (1) lumping, (2) a somewhat general assertion that time spent on specific tasks - such as the initial motions - was excessive, and (3) that some services were unrelated to the preservation of Aspen's collateral and collection of the Note. Finally, the Debtor argues that all of the time billed by BSB in September and October, 2011 should be disallowed because at that point, Aspen "knew" it was going to be paid in full due to the pending Plan and the Second Financing Motion. As to this last point, the Court disagrees. It is neither required nor reasonable to expect a secured creditor to do nothing until it sees whether anticipated financing actually materializes and a plan is consummated. And, in this instance, it is even less reasonable. The Debtor did not propose to pay Aspen's claim in full, but rather sought to require Aspen to release its lien on the Property based on a partial payment and

then to force Aspen to litigate the balance of its claim. While it litigated its claim, Aspen would no longer be entitled to additional interest, fees, or costs and its ultimate source for additional recovery was to be an escrow account, the balance of which would be at least partially depleted by payment of house repairs and administrative expenses.

While the bulk of BSB's fees are reasonable, the Court has determined that a portion of the fees sought should be disallowed. Specifically, fees for excessive time for the task performed ($ 20,066.00), excessive staffing ($ 5,233.75), work performed that is not related to protection of collateral or collection of the Note ($ 10,955.50),[2] insufficient description of the work performed ($ 200.00), work performed at an inappropriate level ($ 437.50) and travel time billed at the full hourly rate ($ 975.00) should be disallowed. In addition, the billing statements show a $1,000 expense September 19, 2011 for an advance of an expert fee to an appraiser who has not yet been called to testify that must be disallowed at this time. The specific charges which the Court is disallowing are detailed in Attachment B, which is incorporated herein. Of total fees and costs charged in the amount of $233,023.51, fees in the amount of $37,867.75 and costs in the amount of $1,000.00 are disallowed, and fees and costs totaling $194,155.76 through December 9, 2011 are allowed.

### c. Post-Petition Fees of The Wix Law Group

Wix was hired by Aspen to pursue the Guaranty Suit. The Debtor's sole objection to Wix's fees – also raised in connection with BSB's fees – is that it was unreasonable for Aspen to incur fees and for its counsel to continue to provide services after the filing of the Second Financing Motion and the Plan. For the reasons set forth above, the Court rejects this argument. In addition, there are no time entries of the Wix firm that appear unreasonable or unnecessary. Consequently, all fees and costs of the Wix Law Group are allowed.

### C. Conclusion

For the reasons set forth herein, it is therefore ORDERED that the Debtor's Objection to Amended Proof of Claim No. 6, filed by Aspen D/S Holdings, LLC, is SUSTAINED in part and OVERRULED in part. For the same reasons, Aspen's claim is ALLOWED in part and DISALLOWED in part as follows:

    a.    The Debtor's objection to the calculation of interest on the Consent Judgment is

---

[2] The reductions taken in this area primarily relate to three types of work performed by BSB: a) claims purchasing; b) threatened lender liability litigation against the Bank; and c) redaction of billing statements. Although the Debtor also objected on the same basis to fees related to claims objections, the Court does not believe that fees for claims objections should be disallowed. No argument was ever made that Aspen did not have standing to file claims objections and, in fact, all of the claims objections were granted to the benefit of the Debtor and the estate.

      DENIED;
- b. The Debtor's objection to Aspen's claim for interest on pre- and post-petition fees, costs and expenses is DENIED.
- c. A portion of Garfield & Hecht, P.C.'s fees, totaling $14,968.00, are DISALLOWED and the balance of Garfield & Hecht's pre- and post-petition fees, plus interest on such fees, are APPROVED;
- d. A portion of Bieging Shapiro & Barber LLP's fees, totaling $ 37,867.75, and costs in the amount of $1,000.00 are DISALLOWED and the balance of Bieging Shapiro & Barber LLP's pre- and post-petition fees and costs, plus interest on such fees and costs, are APPROVED;
- e. The Debtor's objection to the post-petition fees of The Wix Law Group is DENIED; and
- f. Proof of Claim No. 6 filed by Aspen D/S Holdings, LLC, is ALLOWED as of December 9, 2011 in the amount of $4,154,459.72, less disallowed legal fees and costs in the amount of $53,835.75 and any interest charges attributable to the disallowed fees and costs.

DATED 25th day of January, 2012.

                    BY THE COURT:

                    Elizabeth E. Brown,
                    United States Bankruptcy Judge

Attachment A - Fees of Garfield & Hecht, P.C.

Of total fees and costs charged in the amount of $89,377.14, fees in the amount of $14,968.00 are disallowed, and fees and costs totaling $74,409.14 through December 9, 2011 are allowed.

1.   Tasks not appropriate in light of the automatic stay.  **Total Reduction: $4,009.00**

| Date | Tasks performed | Time | Amount |
|---|---|---|---|
| 10/11/10 | Conference regarding bid issues | .2 | 65.00 |
|  | Conference, begin to prepare bid statement | .3 | 58.50 |
| 10/12/10 | Communicate re publication invoice and bid | .3 | 97.50 |
|  | Work on bid and other foreclosure-related issues | .4 | 78.00 |
| 10/14/10 | Draft bid and e-mail client | 1.9 | 370.50 |
| 10/15/10 | Go over and confer re: bid | 2.1 | 409.50 |
|  | telephone call related to bid | .3 | 97.50 |
| 10/18/10 | Work on bid, email re: sale and conference | .6 | 117.00 |
|  | telephone call re sheriff sale issues | .5 | 162.50 |
| 10/19/10 | attend to foreclosure matters | .5 | 97.50 |
|  | telephone call re foreclosure sale, attend to sale issues | .8 | 260.00 |
| 10/20/10 | communicate re: judicial sale lawsuit | .3 | 97.50 |
| 11/1/10 | conference, drafting foreclosure papers | 1.9 | 370.50 |
|  | telephone calls, review and revise foreclosure papers | 1.3 | 422.50 |
| 1/4/11 | Edit and revise bid statement and conference | .3 | 58.50 |
|  | Communicate re: bid statement | .5 | 162.50 |
| 4/18/11 | telephone call re: bid statement | .4 | 130.00 |
| 4/19/11 | same | .1 | 32.50 |
| 5/5/11 | review and file bid statement and e-mail | .5 | 97.50 |
| 5/6/11 | teleconference with Deputy Woolsey | .2 | 39.00 |
| 5/17/11 | review ntc of dismissal of state ct action | .2 | 65.00 |

| 10/13/11 | research and conferences re: resuming foreclosure | 1.0 | 360.00 |
|---|---|---|---|
| 10/14/11 | same | 1.0 | 360.00 |

2.  Insufficient description of the tasks performed: **Total Reduction: $371.00**

| Date | Time | Amount |
|---|---|---|
| 10/29/10 | 1.6 | 312.50 |
| 1/10/11 | .3 | 58.50 |

3.  Work performed not related to preservation/collection of secured claim. **Total Reduction: $5,497.50**

| Date | Task Performed | Time | Amount |
|---|---|---|---|
| 2/7/11 | communications regarding claim purchase | .8 | 195.00 |
| 2/16/11 | work related to Debtor's claims against Bank | 1.8 | 585.00 |
| 3/7/11 | Draft motions for OSC (no such document filed) | 3.0 | 975.00 |
| 5/17/11 | Draft show cause motion | .4 | 130.00 |
| 6/10/11 | telephone calls re: fence encroachment and related survey | .5 | 162.50 |
| 6/30/11 | same | 1.2 | 390.00 |
| 9/12/11 | review transcript of §341 meeting (did not appear from the time entry to be necessary for the work being performed) | 1.0 | 360.00 |
| 10/13/11 | Communication re: trespass and survey | .5 | 180.00 |
| 10/18/11 | work related to title defects and Note purchase agmt | 2.0 | 720.00 |
| 10/19/11 | same | 2.0 | 720.00 |
| 10/20/11 | numerous phone conferences related to Note purchase | 3.0 | 1,080.00 |

4. <u>Work performed at an inappropriate level</u>. **Total Reduction: $ 1,089.00**

   a. On August 18 and 22, 2011, Mr. Schmidt billed 5.6 hours preparing damage hearing binders for Mr. Wix for the Illinois lawsuit. Such work is more properly performed by a paralegal or an associate than by a partner at $360/hr. Accordingly, the Court has reduced the amount billed by the difference between Mr. Schmidt's billable rate and the associate's billable rate. Reduction: 5.6 hrs x $165/hr = $924.00
   b. On September 7, 2011, the Court estimates that Mr. Schmidt billed 1.0 to research interest and indebtedness issues under the loan documents. Again, this is a task that could have easily been performed by an associate at a lower billing rate. Reduction: 1.0 hr x $165/hr = $165.00

5. <u>Travel time billed at the full hourly rate</u>. **Total Reduction: $2,808.00**
   a. On September 14 and 16, 2011, Mr. Schmidt billed for his travel to and from Chicago for the damages hearing in the Guaranty Suit at his full hourly rate. While the Court understands that travel may be necessary and may be fully reimburseable outside of a bankruptcy case, the bankruptcy court does not allow travel time to be billed at an attorney's full hourly rate unless work is actually performed during the entire trip. It does not appear from the billing statements that any work was performed during the travel. As the travel to Chicago was included in a larger lumped entry, the Court has applied the same amount of time for such trip as was billed for the return trip to Aspen. Reduction: 15.6 hrs x $180/hr = $2,808.00

6. <u>Excessive time for the task performed</u>. **Total Reduction: $1,193.50**

| <u>Date</u> | <u>Task Performed</u> | <u>Time</u> | <u>Amount</u> |
|---|---|---|---|
| 5/4/11 | redact billing | 1.0 | 325.00 |
| 5/6/11 | redact LFB fees | .9 | 292.50 |
| 8/15/11 | redact legal bills | .4 | 144.00 |
| 9/7/11 | redact August invoice | .5 | 180.00 |
| 9/19/11 | redact September invoice for Ms. Parlin | .2 | 72.00 |
| 10/12/11 | redact September invoices | .5 | 180.00 |

13

<u>Attachment B - Fees and Costs of Bieging Shapiro & Barber, LLP</u>

Of total fees and costs charged in the amount of $233,023.51, fees in the amount of $37,867.75 and costs in the amount of $1,000.00 are disallowed, and fees and costs totaling $194,155.76 through December 9, 2011 are allowed.

1. <u>Excessive time for the task performed</u>. **Total Reduction: $20,066.00**

    a. On December 5 -13, 2010, Ms. Charlesworth billed 32.4 hours preparing the Aspen Motions and related notices and orders. Although three motions were ultimately prepared and filed, this time is excessive given that none of the motions were particularly novel or complicated and that the receiver was no longer in possession of the Property when the Motion to Excuse Turnover was filed. Although filed early in the case, the Motions are currently in abeyance pending a confirmation hearing by agreement of the parties in March, 2011. Based on Mr. Barber's testimony, the Court rejects Debtor's contention that all time related to the Aspen Motions should be disallowed on the basis that similar motions filed in the First Bankruptcy should have been used instead. Reduction: 17.4 hrs @ $200/hr = $3,480.00
    b. On January 3 - 10 , 2011, Ms. Sandrin billed 1.4 hrs, Mr. Mulligan billed .3 hrs, and Ms. Williamson billed .4 hrs conferring about and preparing pleadings to set a hearing on the turnover motion. As the receiver was no longer in possession of the Property and thus the turnover motion could not be granted as a matter of law, all time spent on such work is unnecessary and excessive. Reduction: 1.4 hrs x $145/hr + .3 hrs x $285/hr + .4 hrs x $325/hr = $418.50
    c. On February 9 - 15, 2011, Mr. Mulligan billed 5.4 hrs, Ms. Williamson billed 1.1 hrs and Mr. Barber billed .5 hrs drafting and revising the objection to the first DIP Financing motion. The objection filed is fairly standard and did not require a combined 7 hours of work by three attorneys. Reduction: 2.4 hrs x $285/hr = $684.00
    d. On March 10-22, 2011, Ms. Williamson billed 10 hrs preparing the offer of proof for the preliminary hearings on the Aspen Motions and the first DIP Financing motion. This time appears to be excessive. Reduction: 3 hrs x $325/hr = $975.00
    e. From August 26, 2011 through October 17, 2011, Mr. Barber, Ms. Williamson, Ms. Pavlin, Mr. Mulligan and Ms. Sorenson billed a collective $9,403.50 related to redacting billing statements, gathering information and preparing exhibits for a payoff statement for both the Second Bankruptcy and the Guaranty Suit. While the Court understands that the payoff is a moving target, this is both excessive time for the task performed and overstaffing. Further, to the extent that the redaction done was overly zealous the first time through, the work was unnecessary. Reduction: $3,403.50
    f. From September 1 - 16, 2011, Ms. Williamson billed 11.8 hrs and Mr. Barber billed 3.2 hrs conferring about and drafting Aspen's objection to the Second financing Motion. This amount is excessive, especially since two partner-level

14

        attorneys were doing all the work.  Reduction: 5.8 hrs x $325/hr + 2.0 hrs x $350/hr = $2,585.00

    g.    On October 3 - 12, 2011, Ms. Williamson billed 22.8 hrs, Mr. Barber billed 9 hrs and Mr. Mulligan billed 3.2 hrs working on Aspen's objection and supplemental objection to the Plan.  Not only is this excessive time for the task involved, but it is also excessive staffing of the task.  Reduction: $5,700.00

    h.    On October 12, 2011, Ms. Charlesworth billed 1.2 hrs to confer and research foreclosure questions, "Sheriff's sale and effect of bankruptcy filing."  As such work was inappropriate in light of the automatic stay, any time billed is excessive. Reduction: 1.2 hrs x $120/hr = $220.00

    i.    From October 13 - 19, 2011, Ms. Williamson billed 20.1 hrs preparing for the October 20, 2011 hearing, which she also billed to attend.  While it is true that a variety of issues were set for that hearing, the time appears to be excessive, particularly given that the hearing was non-evidentiary, as Ms. Williamson confirmed with the Court's staff two days before the hearing.  The billing statements reveal that other attorneys and paralegals also performed various tasks preparing for the hearing.  In recognition of the fact that at least initially the parties were preparing for an evidentiary hearing, the Court will allow more of the time than it would otherwise.  Reduction: 8.0 hrs x $325/hr = $2,600.

2.    <u>Excessive staffing</u>.  **Total Reduction: $5,233.75**

    a.    Mr. Barber billed several hours related to the preparation of the Aspen Orders.  Given his involvement and supervision of the junior attorneys on this matter, it does not appear necessary for Ms. Williamson to have also been involved with revision of the motion to dismiss on December 9, 2010 or to review Ms. White's research for the motion for relief from stay on December 10, 2010.  Reduction: 2.0 hrs @ $325/hr = $650.00

    b.    On January 3 - 13, 2011, Ms. Sorenson billed 3.3 hrs working on the witness and exhibit lists for the upcoming hearings.  As Ms. Charlesworth and Ms. Williamson were also doing the same work, it appears Ms. Sorenson's involvement is unnecessary.  Reduction: 3.3 hrs x $50/hr = $165.00

    c.    On January 7, 2011, Mr. Mulligan billed .2 hrs in an e-mail exchange with Mr. Barber and Mr. Rich and on January 11, 2011, he billed .3 hrs to review and confer about an equity spreadsheet.  An overall review of the bills from that time period indicates that Mr. Mulligan's involvement in the case was peripheral at most and that the case was adequately staffed by several other attorneys at the firm.  Reduction: .5 hrs x $285/hr = $142.50

    d.    On January 7 - 11, 2011, Mr. Barber billed 1.3 hrs to confer about and revise the witness and exhibit lists for the hearing on the Aspen Motions.  This work was more than adequately covered by Ms. Williamson and Ms. Charlesworth. Reduction: 1.3 hrs x $350/hr = $455.00

    e.    On March 3, 2011, Mr. Mulligan billed .3 hrs related to potential stipulations on the Aspen and DIP Financing motions.  Given that Mr. Barber and Ms.

    Williamson, both partners, appear to have been the primary attorneys who worked on the issue, Mr. Mulligan's involvement was not necessary. Reduction: .3 hrs x $285/hr = $85.50

  f. On March 4 - 10, 2011, Ms. Williamson billed 2.0 hrs and Mr. Barber billed 3.0 hrs reviewing Debtor's plan and disclosure statement. Given Mr. Barber's level of expertise, this appears to be unnecessary duplication and Mr. Barber's time also appears to be excessive. Reduction: $700.00

  g. On March 24, 2011, Mr. Barber billed 7.0 hrs and Ms. Williamson billed 6.9 hrs preparing for and attending the preliminary hearing on the Aspen and DIP Financing motions, which ultimately resulted in a stipulation during the hearing. The participation of two partners is excessive, especially since Ms. Williamson subsequently billed an additional 4.8 hrs preparing and filing the stipulation reached. Reduction: ½ of Ms. Williamson's time = $1,121.25

  h. On March 25, 2011, Ms. Charlesworth billed .3 hrs conferring with Mr. Barber about the hearings and proposed orders. It appears from the billing statements that Ms. Charlesworth did no other work on this issue, which was primarily handled by Mr. Barber and Ms. Williamson. Reduction: .3 hrs x $200/hr = $60.00

  i. On April 19, 2011, Ms. Meyer billed 6 hrs to confer with Ms. Williamson and draft a Motion to Compel Discovery. The billing statements show that she performed no other work on this matter, but Ms. Williamson billed over 5 hours drafting, conferring about and filing the same motion. Accordingly, it appears Ms. Meyer's work was duplicative and unnecessary. Reduction: 6.0 hrs x $175/hr = $1,050.00

  j. On May 23, 2011, Mr. Mulligan billed .2 hrs to review the reply to the motion to vacate the stay relief order and confer with Ms. Williamson. This matter was adequately staffed by Ms. Williamson and Mr. Barber. Reduction: .2 hrs x $285/hr = $57.00

  k. On July 12, 2011, Mr. Barber, Ms. Williamson and Ms. Dawes all billed 1.3 hrs to confer about confirmation issues and analysis questions. Two partners and an associate is excessive. Reduction: 1.3 hrs x $325/hr = $422.50

  l. On September 19, 2011, Mr. Mulligan billed 2.6 hrs researching late payment charges and Ms. Williamson billed an hour to review the case law on the same issue. Reduction: 1.0 hrs x $325/hr = $325.00

3. <u>Work performed not related to preservation/collection of secured claim</u>. **Total Reduction: $10,955.50**

| <u>Date</u> | <u>Biller</u> | <u>Task</u> | <u>Time</u> | <u>Amount</u> |
|---|---|---|---|---|
| 12/9/10 | DEB | confer re: claims purchasing | .2 | 70.00 |
| | AW | review reactions to research | .2 | 50.00 |

16

|          | CMS | prep work for claims purchase                    | 1.1 | 159.50 |
|----------|-----|--------------------------------------------------|-----|--------|
| 12/16/10 | EC  | claims purchase work                             | 1.2 | 240.00 |
|          | CMS | same                                             | 1.6 | 232.00 |
| 12/17/10 | EC  | same                                             | 1.8 | 360.00 |
|          | DEB | same                                             | .55 | 192.50 |
|          | CMS | work/conferences related to claims purchasing    | .9  | 130.50 |
| 12/20/10 | EC  | same                                             | .4  | 80.00  |
|          | DEB | same                                             | .2  | 70.00  |
| 12/21/10 | DEB | same                                             | 1.0 | 350.00 |
|          | STM | same                                             | .2  | 57.00  |
|          | EC  | same                                             | 1.6 | 260.00 |
|          | JW  | same                                             | .2  | 65.00  |
| 12/22/10 | DEB | same                                             | .8  | 280.00 |
|          | STM | same                                             | .1  | 28.50  |
|          | EC  | same                                             | 2.4 | 480.00 |
|          | JW  | same                                             | .4  | 130.00 |
| 12/23/10 | DEB | same                                             | .4  | 140.00 |
|          | STM | same                                             | .1  | 28.50  |
|          | EC  | same                                             | 1.2 | 220.00 |
| 12/27/10 | CMS | same                                             | .7  | 101.50 |
| 12/28/10 | EC  | same                                             | .2  | 40.00  |
|          | JW  | same                                             | .6  | 195.00 |
| 12/29/10 | DEB | same                                             | .3  | 105.00 |
|          | EC  | same                                             | .6  | 60.00  |
| 12/30/10 | DEB | same                                             | .2  | 70.00  |
|          | CMS | same                                             | .2  | 29.00  |
|          | EC  | same                                             | .4  | 40.00  |

| 1/3/11 | CMS | same | 1.0 | 145.00 |
|---|---|---|---|---|
| 1/4/11 | DEB | same | .3 | 105.00 |
| 1/12/11 | DEB | email regarding lender liability claims | .2 | 70.00 |
| 1/13/11 |  | claims purchase work | .1 | 35.00 |
|  | CMS | same | .5 | 72.50 |
| 2/1/11 | EC | claims purchase work | .8 | 160.00 |
|  | STM | same | .1 | 28.50 |
|  | JW | same | .3 | 97.50 |
| 2/2/11 | EC | same | 1.8 | 360.00 |
|  | STM | same | .2 | 57.00 |
|  | JW | same | .5 | 162.50 |
| 2/3/11 | CMS | same | .1 | 14.50 |
| 2/8/11 | EC | same | .4 | 40.00 |
|  | STM | same | .7 | 199.50 |
|  | CMS | same | .8 | 116.00 |
|  | JW | same | .2 | 65.00 |
| 2/10/11 | CMS | same | .2 | 29.00 |
| 2/11/11 | STM | same | .4 | 114.00 |
|  | CMS | same | .8 | 116.00 |
|  | JW | same | .8 | 260.00 |
| 2/14/11 | STM | same | .1 | 28.50 |
|  | JW | same | .2 | 65.00 |
| 2/15/11 | STM | same | .6 | 171.00 |
|  | DEB | same | .8 | 280.00 |
| 2/16/11 |  | same | .4 | 140.00 |
| 3/1/11 | DEB | work re: lender liability claims | .2 | 70.00 |
| 3/2/11 |  | same | 1.5 | 525.00 |

| 3/9/11 |     | same | .25 | 87.50 |
|--------|-----|------|-----|-------|
|        | JW  | same | .2  | 65.00 |
| 3/10/11 | DEB | same | 1.0 | 350.00 |
|        | JW  | same | .4  | 130.00 |
| 3/11/11 |     | same | .4  | 130.00 |
| 3/14/11 |     | same | .5  | 162.50 |
| 5/11/11 | JW  | redactions to billing statements | 2.0 | 650.00 |
|        | KP  | same | .7  | 105.00 |
| 5/12/11 | JW  | same | 1.6 | 520.00 |
|        | KP  | same | .8  | 120.00 |
| 6/30/11 | DEB | telephone call re: title issues | .2 | 70.00 |
| 7/12/11 | DEB | same | .1  | 35.00 |
| 10/16/11 | DEB | work on title issues | .8 | 280.00 |
| 10/17/11 |    | same | .5  | 175.00 |
| 10/18/11 |    | same | 1.0 | 325.00 |

4. <u>Insufficient description of the work performed</u>.  **Total Reduction: $200.00**

| Date | Biller | Time | Amount |
|------|--------|------|--------|
| 12/27/10 | DEB | .2 | 70.00 |
|          | EC  | .3 | 60.00 |
| 12/28/10 | DEB | .2 | 70.00 |

5. <u>Work performed at an inappropriate level</u>.  **Total Reduction: $437.50**

    a. On January 10, 2011, Mr. Barber billed .5 hrs at $350/hr and on January 11, 2011, Ms. Williamson billed .8 hrs organizing exhibits for the hearing on the Aspen Motions.  This work is more appropriately performed by a paralegal or junior associate and will be reduced to the junior associate's billing rate.  Reduction: .5 hrs x $150/hr + .8 hrs x $125/hr = $175.00

    b. On October 12, 2011, Ms. Williamson billed 1.5 hrs to begin "assembling exhibits for confirmation hearing."  This is a paralegal task more appropriately

       performed at a paralegal rate ($150/hr) than at a partner rate. Reduction: 1.5 hrs x $175/hr = $262.50

6. <u>Travel time billed at the full hourly rate</u>. **Total Reduction: $975.00**

    a. On January 14, 2011, Ms. Williamson billed at her full hourly rate to travel to and from Debtor's property to inspect it with the appraiser. The bankruptcy court does not allow travel time to be billed at an attorney's full hourly rate unless billable work is performed during such travel. Reduction: 6.0 hrs x $162.50/hr = $975.00

7. <u>Expenses that cannot be allowed</u>. **Total Reduction: $1,000.00**

    a. On 9/19/11, there is an expense item for a $1,000 advance to an appraiser for expert testimony who has not yet been called as a witness in this matter. Such charge is not appropriately passed on to the Debtor at this time.